UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON LAFOY READING, | Case No. 1:17-cv-01424-JDP (HC) |
| Petitioner, | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | ECF No. 1 |
| SCOTT FRAUENHEIM, | |
| Respondent. | |

Petitioner Aaron Lafoy Reading, a state prisoner without counsel, seeks a writ of habeas corpus under 28 U.S.C. § 2254.[1] Petitioner was accused of (1) threatening his ex-girlfriend by saying that he would sell their daughter, (2) breaking into his ex-girlfriend's home, and (2) kidnapping the aforementioned daughter. Petitioner challenges his conviction for making threats, citing inconsistencies in statements made by the government's key trial witness, his ex-girlfriend. According to petitioner, his ex-girlfriend changed her story—at one point saying that he threatened her via text message, at another point that he did so via Facebook message, and at a third point that he threatened her orally. Petitioner does not deny that he threatened his ex-girlfriend. The petition fails because the alleged inconsistency in the ex-girlfriend's statements

---

[1] The parties have consented to the jurisdiction of a magistrate judge.

1

does not reveal any infirmity in petitioner's trial.

**I.      Background**

This case arises from a series of domestic disturbances involving petitioner, his ex-girlfriend, Arlene M., and their infant daughter, E. Petitioner allegedly threatened to take E. and sell her in San Francisco. He then entered Arlene's residence, grabbed E. from her crib, drove away, and was arrested. Petitioner was convicted of kidnapping, burglary, and attempted criminal threats, *see* Cal. Penal Code §§ 207, 459, 422, 664, and was sentenced to an aggregate prison term of sixteen years and eight months.

We set forth below the facts of the underlying offenses, as stated by the California Court of Appeal, Fifth District ("Court of Appeal"). A presumption of correctness applies to these facts. *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015). All alterations come from the original.

> Arlene was living in New York when she met defendant on the Internet. In February 2012, Arlene moved to San Francisco and started living with defendant.
>
> In March 2012, defendant and Arlene moved to Corcoran. Arlene was pregnant with their child. Defendant and Arlene lived together in a fifth-wheel trailer parked next to the house of defendant's father, Ronald Reading (Ronald).
>
> In November 2012, Arlene gave birth to their daughter, E. In December 2012, Arlene and the baby moved from the trailer into Ronald's house. Defendant slept in the trailer, but defendant and Arlene were still together as a couple.
>
> ***Defendant's initial threats about their child***
>
> Arlene testified that throughout her relationship with defendant, he said he was going to send Arlene back to New York and sell her child. Defendant began making the threats about selling the child from the beginning of Arlene's pregnancy, in approximately March 2012. Defendant made these statements "[w]eekly at the very least."
>
> Arlene testified she was terrified about these threats. Defendant continued to make the threats after E. was born, and said he would take the child and sell her in San Francisco: "[H]e just said that she was cute and he could make a lot of money off of her, and he was going to sell her."
>
> Arlene testified about an incident that occurred in December 2012, when Arlene and the baby were living at Ronald's house, and

2

defendant was sleeping in the trailer. Arlene went to the trailer to visit him. Defendant was drunk and wanted to have sex, but Arlene refused. As she left the trailer, defendant slapped her in the back of her head.

Arlene testified she never called the police about anything that happened while they were living at Ronald's house.

*Arlene moves to Tulare*

On or about July 1, 2013, Arlene and her child left Ronald's house. They moved to a trailer park in Tulare and lived with defendant's brother, Christopher Gallagher. Defendant also stayed at the trailer.

Arlene testified that when they moved out of Ronald's house, defendant "was told" to give back all the keys to his father. She assumed that he did.

Arlene testified about an incident that occurred early in July 2013. She was at the trailer with defendant and his brother. Defendant picked up E. from the floor by her shirt. He took the child into another room and "barricaded the door shut." Arlene tried to open the door to get her child. Defendant's brother managed to open the door, and Arlene took the child. Defendant slapped Arlene in the face with an open hand.

Arlene testified they were served with an eviction notice from the trailer in Tulare. Defendant packed up his things, said he was driving to San Francisco, and left. An hour later, he returned to the trailer. "And he camped out on my front porch and walked around the house in circles banging on the doors and windows, and [I] called the cops about four times." Defendant sent a text message to Arlene saying that he could break into the trailer, and "there was nothing [she] could do about it."

Arlene testified about another incident that occurred in July 2013, as she was in the process of moving from the trailer in Tulare back to Ronald's house in Corcoran. Defendant again said he was going to sell E. He also said the child would be better off in foster care.

Arlene testified the police were called to the Tulare trailer numerous times to deal with her conflicts with defendant. She told the officers about defendant's threats to take her child. The officers said "they couldn't do anything about it, it was a civil matter" because E. was defendant's child.

*Arlene moves back to Corcoran*

As of July 11, 2013, Arlene and her child moved back to Ronald's house in Corcoran. Arlene returned there because her own family was in New York, and she had nowhere else to go. Arlene testified defendant did not move back to Ronald's house with her. Arlene believed defendant stayed at his brother's trailer in Tulare.

3

Ronald testified that he and his wife decided to allow only Arlene and the baby to move back to their house. They did not allow defendant to live there. Arlene believed defendant was not welcome at his parents' house.

### *The first restraining order*

Arlene testified that after she moved back to Corcoran, defendant repeatedly called and sent her text messages. In the period between July 17 and 18, 2013, he sent her 66 text messages and called 59 times. She did not respond.

On or about July 18, 2013, Arlene printed out the numerous text messages, went to the police department, and filed for a restraining order because of defendant's conduct. A temporary restraining order was issued to keep defendant away from Arlene and E.

On July 18, 2013, Corcoran Police Officer Evette Galutara spoke with Arlene at the police department. Arlene told Galutara that she received about 43 calls and 16 messages in the previous 24 hours from defendant. Galutara testified Arlene did not show her the messages. Arlene "appeared to be a little worried about her daughter, and about her daughter's father coming to town." Arlene said she filed the paperwork for a restraining order that day.

Officer Galutara told Arlene that she had to serve defendant with the restraining order to keep him away from his own child.

"I told her that it needed to go through the courts and be processed, and then we needed a paper verifying that in order to keep him away, or anything dealing with a restraining order and child custody."

While a temporary restraining order (TRO) was issued to keep defendant away from Arlene and E., it was never served on defendant. Arlene knew it was never served on him.

### *Defendant's Facebook posts to friends*

In July and August 2013, defendant posted numerous statements on his Facebook page about his relationship with Arlene

On July 12, 2013, defendant posted to his friend, Kelsey: "Waiting for Ally [Arlene] to come outside to talk." Kelsey asked why, and defendant said he was bored and it was for fun. Defendant also wrote: "Hiding in the shadows" and "'sitting here in the car . . . [o]n the side street." Defendant later posted that he "'came back home," and that "'Ally [Arlene] was scared." Kelsey asked what she was scared about, and defendant replied: "'Me."

On July 20, 2013, defendant had an exchange with another friend, Kerianne, and asked: "Is it legal to take my child and disappear with her?" Kerianne replied he had equal rights to her if there wasn't a custody agreement.

4

On July 30, 2013, defendant exchanged messages with Kerianne about Arlene's temporary restraining order. Defendant said he knew about the order, even though it was not served on him. He wrote: "Girlzilla filed a protective order to keep me from seeing my child but she can't serve me." Kerianne asked if Arlene knew where he was. Defendant replied no, and wrote that it "forces me to stay away from my dad's house where she is staying, but I technically live there, so how does that work." Defendant also wrote: "My mail and DMV stuff goes there, so I can say *Im* a resident there, too. Judge will throw it out I bet also *cuz* there is no merit for a PO." Defendant continued: "*Its* no good *til* a *sherrif* serves me I was told" and "I need to find out when the hearing is so I can show up and win the case."

Also on July 30, 2013, defendant sent text messages on his cell phone to various friends, which included the statement that something was going to happen: "Nothing illegal. Just hateful."

On July 31, 2013, defendant had a Facebook exchange with Chris Gallagher and Andrew Reading about his relationship with Arlene, and he made the following statements: "She will be a career welfare mother. She provides nothing for the child and never will, to be continued," and "Theres [*sic*] a surprise on the horizon." Gallagher asked what, and defendant said "I'll let you know later." Andrew Reading asked, "*Whats* going on?" to which defendant replied: "Something huge is *gunna* happen in a few days," "I am *gunna* be on the news," and "Just wait and see." Andrew Reading asked what it was all about. Defendant posted a series of replies: "Channel 26 Primetime," "6:00 news," "Yeah. It is gunna [*sic*] be craziness," and "News chopper 26."

*Defendant's messages to Arlene*

After obtaining the restraining order, Arlene changed her telephone number twice so defendant could not contact her. However, defendant started sending messages to Arlene on her Facebook page. Arlene had a private account and defendant was not a "friend," but he could still send messages to her.

On July 31 and August 1, 2013, Arlene received several messages on her Facebook page from defendant. The messages said: "[D]on't make visitation day akward [*sic*]. It's coming very soon. If we keep letting things boil over, things may go very wrong during visitation. Think about it." He also wrote: "[O]k so were escalating this. Ok im [*sic*] all in. war time. Your TRO is DOA. Its [*sic*] trash cuz [*sic*] you have to have it served to go into effect[]" and "Im [*sic*] gunna [*sic*] shake the world in a few days." "I'm living it up here. Kickback and so relaxing. Having a blast. *I really don't care about the child.*"

Arlene testified she was terrified defendant was going to take E. and sell her in San Francisco, as he previously threatened to do. She feared "[i]t could be sex trade, it could be drugs, it could be anything. I would never see her again."

5

On August 1, 2013, defendant posted a copy of a Twitter post from Arlene on his Facebook page. In her Twitter post, Arlene wrote she was lonely and missed defendant. Defendant then engaged in an exchange with Kerianne about Arlene's post, and he wrote: "The calm before the storm," and "Her TRO is null and void."

*Arlene's second report to the police*

On August 1, 2013, Officer Galutara called Arlene and asked if she had any other issues. Arlene said she was having more problems because defendant was sending messages to her. Arlene again went to the police department and gave defendant's messages to Galutara. Galutara testified Arlene was "pretty upset, she was crying. She kept telling me she was scared and worried" that defendant was going to "drive into Corcoran because apparently he didn't live there." Arlene testified she told the officer that she was afraid defendant was going to steal her baby.

*The burglary and kidnapping*

Around 5:30 a.m. on August 2, 2013, Arlene and her child were living at the home of defendant's father in Corcoran. E. slept in the same bedroom as Arlene Arlene and the child were asleep. Defendant's parents were at work, and no one else was home.

Defendant entered his parents' house. Arlene did not wake up when defendant entered the house, but she heard noise from her bedroom door and realized it had been opened.

Arlene woke up and discovered defendant was in her bedroom, and he was "stealing my daughter out of her crib." Defendant grabbed E. and the child screamed. Arlene testified defendant ran away, and held E. with his arms extended in front of him. Arlene screamed "no" and ran after defendant. He ran to his car, which was parked in front of the neighbor's house. Arlene ran a couple of "arms lengths" behind him. As Arlene ran after defendant, she tripped and fell in the front yard and injured her leg. Arlene watched defendant get into his car with E., who continued to scream. He placed E. on his lap and drove away.

Arlene was distraught. She went back into the house and immediately called 911. She did not see any signs of a forced entry into the house.

*The police response*

Officer Benjamin Beavers responded to Ronald's house on a dispatch about a family dispute. When he arrived, the front screen door was closed but the interior door was open. Arlene was inside and he spoke to her through the screen door. Arlene "seemed very distraught, she was crying, she was yelling for help." Arlene said: "I can't open the door, please help me. He took my daughter. He took the doorknob off the door, and I can't get out." Arlene told Beavers the screen door's handle was on the ground.

Officer Beavers found the handle and knob for the screen door on the ground. He picked them up, replaced them in the slot, and opened the door for Arlene.

Arlene told Officer Beavers that defendant took E. while the baby was asleep in her crib. Arlene said she was asleep when she heard a popping noise, like her bedroom door being opened. She woke up and looked toward the bedroom door. She said defendant quickly grabbed the child, ran out of the bedroom, and left through the front door. Arlene said she chased him and he left the screen door somewhat ajar, so she was able to get out. Arlene said she could not stop defendant, and he drove away in his car. Arlene said she was able to get back into the house, but became stuck inside because the handle had been removed from the screen door.

*The search for defendant and the baby*

Arlene gave a detailed description of defendant and his car. Officer Beavers confirmed the details about defendant's car and registration, and the Corcoran Police Department broadcast a statewide dispatch about the child abduction.

Detective Alex Chavarria was part of the team that tried to find defendant and the baby. Chavarria received a dispatch that defendant's cell phone company had "pinged" defendant's cell phone and located him in Tulare. Chavarria went to a particular location but he did not see defendant or his car. Chavarria then received information that defendant was possibly heading to San Francisco, and his cell phone was "pinging" just north of Chavarria's position on Betty Avenue near Highway 99.

Detective Chavarria drove onto northbound Highway 99. He was driving his own unmarked vehicle. When Chavarria was about 60 miles north of Corcoran, he saw defendant's car traveling on northbound Highway 99 near Avenue 7, just north of Fresno.

Detective Chavarria followed defendant in his unmarked vehicle and contacted the California Highway Patrol. Chavarria testified defendant continued to travel on northbound Highway 99, "which is the general direction of San Francisco, which [we] believed he was headed." Defendant did not stop or turn off the highway.

*Arrest of defendant*

Officer James Yates of the California Highway Patrol monitored the broadcasts about defendant's car. Yates joined the pursuit on northbound Highway 99 in Madera. He saw defendant's car and conducted a traffic stop; defendant pulled over.

As Officer Yates approached the vehicle, he saw movement in the backseat and drew his gun. He thought another suspect might be in the car. When he looked inside, he saw E. in the back seat. The child was buckled into a car seat. However, the car seat was not correctly secured to the back seat, and it had shifted forward and sideways. "There was a good ten-inch gap between the back rest

7

and the edge of the car seat." Yates testified the child was not in a safe situation "by any stretch of the imagination." If defendant had been in a crash, the car seat was not secure, and the child was at risk for injury or death.

Officer Yates testified E. was holding a large plastic bag that was about two feet by three feet. It was a heavier type of plastic than a plastic grocery or trash bag. E. "had a grasp on it and had it pulled over its face when I first approached" the car, and there was an absolute suffocation risk. Yates took the bag away from the baby.

Defendant was arrested at the scene and transported back to Corcoran.

About six hours after the kidnapping, an officer returned E. to Arlene in Corcoran. Arlene obtained another restraining order against defendant because she knew the first order had not been served on him. Arlene was still afraid of defendant, and afraid he would "be able to get out and take my kid." The second order was successfully served on defendant.

***Arlene's testimony about defendant's threats***

At trial, Arlene testified that she continued to live with defendant even though he threatened to sell their child. She did not report the threats to the police because she was afraid defendant would hit her; he would send Arlene "back to New York to nothing"; and he would "do something terrible" to the baby.

Q. Was there a reason why you didn't report the threats [defendant] made to you about selling your child?

A. I didn't really think that it would happen.

Q. And when you—when did you start believing it would happen?

A. When—I don't know honestly.

Q. Did you believe he would sell your baby?

A. I tried really hard not to.

Q. But did you?

A. When he took her, yes.

Arlene testified that when she went to the police on August 1, 2013, she had "no doubt that he would take" and sell the baby.

Q. So the day before [the burglary/kidnaping] when you reported to the police, you did believe that he would take your baby and he would sell your baby?

A. Yes.

*People v. Reading*, No. F068602, 2016 WL 69342, at *1-6 (Cal. Ct. App. Jan. 5, 2016).

**II.      Discussion**

A federal court may grant habeas relief when a petitioner shows that his custody violates federal law. *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75 (2000). Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition. *See* § 2254; *Harrington v. Richter*, 562 U.S. 86, 97 (2011); *Woodford v. Garceau*, 538 U.S. 202, 206-08 (2003). To decide a Section 2254 petition, a federal court examines the decision of the last state court that issued a reasoned opinion on petitioner's habeas claims. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court reviews the state court's decision under the deferential standard of Section 2254(d). Section 2254(d) precludes a federal court from granting habeas relief unless a state court's decision is (1) contrary to clearly established federal law, (2) a result of an unreasonable application of such law, or (3) based on an unreasonable determination of facts. *See* § 2254(d); *Murray v. Schriro*, 882 F.3d 778, 801 (9th Cir. 2018). A state court's decision is contrary to clearly established federal law if it reaches a conclusion "opposite to" a holding of the United States Supreme Court or a conclusion that differs from the Supreme Court's precedent on "materially indistinguishable facts." *Soto v. Ryan*, 760 F.3d 947, 957 (9th Cir. 2014) (citation omitted). The state court's decision unreasonably applies clearly established federal law when the decision has "no reasonable basis." *Cullen v. Pinholster*, 563 U.S. 170, 188 (2011). An unreasonable determination of facts occurs when a federal court is "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Loher v. Thomas*, 825 F.3d 1103, 1112 (9th Cir. 2016). Further, a federal habeas court has an obligation to consider arguments or theories that "could have supported a state court's decision." *See Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2557 (2018) (quoting *Richter*, 562 U.S. at 102). In addition, one rule applies to all state prisoners' petitions adjudicated on the merits: the petitioner must show that the state court's decision is "so lacking in

9

justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

Even when a state court does not explicitly address a petitioner's claims on the merits, a Section 2254 petitioner must satisfy a demanding standard to obtain habeas relief. When a state court gives no reason for denying a petitioner's habeas claim, a rebuttable presumption arises that the state court adjudicated the claim on the merits under Section 2254(d). *See Richter*, 562 U.S. at 99. And a federal habeas court's obligation to consider arguments or theories that could support a state court's decision extends to state-court decisions that offer no reasoning at all. *See Sexton*, 138 S. Ct. at 2557.

If a state court denies a petitioner's habeas claim solely on a procedural ground, then Section 2254(d)'s deferential standard does not apply, *see Visciotti v. Martel*, 862 F.3d 749, 760 (9th Cir. 2016), but the petitioner faces another hurdle: if the state court's decision relies on a state procedural rule that is "firmly established and regularly followed," the petitioner has procedurally defaulted on his claim and cannot pursue habeas relief in federal court unless he shows that the federal court should excuse his procedural default. *See Johnson v. Lee*, 136 S. Ct. 1802, 1804 (2016); *accord Runningeagle v. Ryan*, 825 F.3d 970, 978-79 (9th Cir. 2016). If the petitioner has not pursued his habeas claim in state court at all, the claim is subject to dismissal for failure to exhaust state-court remedies. *See Murray*, 882 F.3d at 807.

If obtaining habeas relief under Section 2254 is difficult, "that is because it was meant to be." *Richter*, 562 U.S. at 102. As the Supreme Court has put it, federal habeas review "disturbs the State's significant interest in repose for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." *Id.* at 103 (citation omitted). Our habeas review authority serves as a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 102-03.

Here, petitioner raises two habeas claims: (1) the government failed to disclose evidence of prior inconsistent statements made by petitioner's ex-girlfriend, Arlene M., in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); and (2) petitioner received ineffective assistance from his

trial counsel, who failed to cross-examine Arlene using her prior inconsistent statements. The Court of Appeal rejected both claims as conclusory. The California Supreme Court summarily denied review.

### a. Alleged *Brady* Violation

Before trial, Arlene said in her police statements that petitioner threatened her in text messages and Facebook messages, stating that he would kidnap and sell their child. At trial, Arlene testified that, while she was pregnant with E., petitioner threatened her at least once per week, telling her that he would kidnap E. and sell her in San Francisco. Arlene testified that he repeated this threat at some point after E.'s birth. Petitioner does not deny that he made such a threat orally, but focuses on the distinction between a threat made orally and one made by electronic means.

In his state habeas proceeding, petitioner argued that the prosecutor committed a *Brady* violation by failing to disclose records of petitioner's own cellphone text messages, which petitioner claimed he could have used to impeach Arlene's trial testimony that petitioner threatened her via text message. The Court of Appeal summarily rejected petitioner's claim as unsubstantiated. In this habeas proceeding, petitioner advances the same claim, arguing that the prosecutor should have disclosed the records of petitioner's text messages. *See* ECF No. 1 at 5-6, 39-41, 46-50. We conclude that the Court of Appeal did not unreasonably reject petitioner's *Brady* claim.

Under *Brady* and its successors, a state can violate a criminal defendant's due process rights by failing to disclose evidence that is material to the defendant's guilt or punishment. *See Cone v. Bell*, 556 U.S. 449, 451 (2009); *Brady*, 373 U.S. at 87; *Browning v. Baker*, 875 F.3d 444, 459 (9th Cir. 2017). A criminal defendant claiming a *Brady* violation must show: (1) the evidence at issue is favorable to him either because it is exculpatory or impeaching; (2) the government suppressed the evidence, either willfully or inadvertently; and (3) the defendant suffered prejudice. *See Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Shelton v. Marshall*, 796 F.3d 1075, 1083 (9th Cir. 2015). We assume that petitioner has satisfied the first requirement, and so focus on the second and third requirements.

11

A reasonable jurist could conclude that the government did not suppress petitioner's text messages. The government does not "suppress" evidence under *Brady* when a criminal defendant was aware of, and had equal access to, the relevant evidence. *See Jones v. Ryan*, 733 F.3d 825, 838 (9th Cir. 2013) (rejecting a habeas *Brady* claim for failure to disclose evidence held by a manufacturer of electronic monitoring devices and noting, "Jones had equal access to information regarding BI's alleged problems as did the State . . . Jones cannot now complain that the State violated *Brady* at the habeas corpus stage by not bringing the evidence to his attention.") (internal citation omitted); *Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006) ("[W]here the defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence, the Government does not commit a *Brady* violation by not bringing the evidence to the attention of the defense."); *Jimenez v. Blades*, No. 1:15-cv-00484, 2018 WL 6591918, at *8 (D. Idaho Dec. 14, 2018) ("Petitioner's *Brady* argument fails because he knew about the evidence and had equal access to have it tested before trial. . . . Evidence is not considered 'withheld' by the prosecution if Defendant's counsel knew about it and could have requested testing.").

Here, petitioner appears to have had equal access to the evidence at issue. The allegedly undisclosed evidence consisted of petitioner's own text messages, and petitioner does not explain why he needed the government to obtain those messages for him. Petitioner gives us no reason to doubt that he knew of his own text messages, or that could have obtained copies of them— presuming he no longer had access to them through his smartphone or computer—by making a request to his cellular service provider. Petitioner therefore cannot prevail on his *Brady* claim. *Cf. Raley*, 470 F.3d at 804 ("Because Petitioner knew of the existence of the evidence, his counsel could have sought the documents through discovery.").

A reasonable jurist could also conclude that petitioner suffered no prejudice. Courts use the terms "prejudice" and "materiality" interchangeably for *Brady* purposes. *See Shelton*, 796 F.3d at 1084 n.9. To show prejudice or materiality, the petitioner must show a "reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 281. A reasonable probability does not require the petitioner to show that he "would more likely than not have received a different verdict with the evidence," but only that the likelihood of

a different result is great enough to 'undermine' the court's "confidence in the outcome of the trial." *See Smith v. Cain*, 565 U.S. 73, 75 (2012).

Evidence impeaching a witness "may not be material if the State's other evidence is strong enough to sustain confidence in the verdict." *See id.* at 76; *accord Payton v. Davis*, 906 F.3d 812, 822 (9th Cir. 2018) (rejecting a habeas *Brady* claim given the government's other evidence of petitioner's guilt). Evidence impeaching a witness may also be rejected as immaterial when it pertains to an ancillary matter. *See Reis-Campos v. Biter*, 832 F.3d 968, 976 (9th Cir. 2016) (finding no materiality when the undisclosed evidence contradicted the witness's statements on gang members' violent activities and tendencies, when a party had presented the witness to opine whether the killing at issue was gang-related); *Roberts v. Howton*, 13 F. Supp. 3d 1077, 1108 (D. Or. 2014) (reasoning that a witness's inconsistent statements on the date when a sleeping bag used to transport a dead body was placed in the petitioner's truck had insufficient import to be material, when the date the bag was placed in petitioner's truck was of secondary importance). The "AEDPA's extremely deferential standard" applies to this inquiry, *Reis-Campos*, 832 F.3d at 975, and a federal habeas court considers whether the state court's decision was objectively unreasonable to conclude that "there was not a reasonable probability that the jury would have reached a different result." *Browning*, 875 F.3d at 464.

Here, petitioner has not established that the undisclosed evidence had adequate impeachment value because petitioner's Facebook messages admitted at trial showed that he did in fact send threatening messages to Arlene. On July 18, 2013, Arlene obtained a restraining order against petitioner. RT 1:39-41, 2:308; CT 1:147-53.[2] The restraining order temporarily stripped petitioner of his custody rights. RT 1:41-42; CT 1:147-53. On July 31, 2013, petitioner posted on his Facebook page that Arlene would be "a career welfare mother" and that she provided "nothing for the child and never will." Supp. CT 1:33. The next day, petitioner posted again on Facebook, stating, "her TRO is null and void." *Id*. Petitioner then sent Arlene these

---

[2] All "RT" citations refer to the reporter's transcript. All "CT" citations refer to the clerk's transcript. All "Supp. CT" citations refer to the supplemented clerk's transcript. Respondent has lodged these documents with this court. *See* ECF No. 14.

`
13

Facebook messages:

> ok so were escalating this . . . ok im all in.. ar time. Your TRO is DOA. . . . im gunna shake the world in a few days.

> Don't make visitation day akward. Its coming very soon. If we keep letting things boil over, things may go very wrong during visitation.

Supp. CT 9, 45 (ellipses in original). Arlene testified that after reading these messages, she thought petitioner planned to kidnap her child. RT 1:46-47. Although the Facebook messages did not explicitly mention kidnapping, Arlene could construe them as threats to kidnap the child, given the context. Arlene had a restraining order against petitioner that stripped him of his custody rights, and petitioner does not deny having said orally that he would kidnap and sell Arlene's child. Arlene also knew of a prior incident in which petitioner had taken the child away from her: petitioner had once picked up the child by her shirt, placed her in a bedroom, and barricaded himself with the child in the room. RT 1:35-36. Given Arlene's experience with petitioner, she could infer from the Facebook messages sent by petitioner that he would kidnap the child—as he eventually did.

Petitioner emphasizes that his Facebook messages did not explicitly state that he would kidnap and sell the child in San Francisco, ECF No. 16 at 2, but this observation is trivial. As noted above, Arlene could have read petitioner's messages as threats of kidnap. The jury could also have found that her memory was imperfect, but that her testimony still supported the jury's verdict. Victims "often confuse the details of particular incidents," and we do not expect perfect recall from a victim—or any witness. *See generally Ren v. Holder*, 648 F.3d 1079, 1085-86 (9th Cir. 2011). Arlene may have forgotten whether petitioner threatened her in text messages, Facebook messages, or orally; this would hardly prove her dishonesty. What mattered here was whether petitioner threatened to take away Arlene's child, and the jury had ample evidence that he did. Because the jury could find Arlene that did not lie when she stated that petitioner had threatened via message to take away her child, the introduction of the undisclosed messages might have had little effect on the jury's assessment of Arlene's honesty.

In sum, petitioner's *Brady* claim has no merit. We decline to grant habeas relief on this

14

1 claim.

### b. Alleged Ineffective Assistance of Counsel

Petitioner advances a similar argument in support of his ineffective assistance of counsel claim: that his trial counsel was ineffective because the attorney failed to impeach Arlene with her prior inconsistent statements in certain police reports. One police report states, "Ar[]lene stated one of the text messages stated he was going to take his daughter . . . and sell her in San Francisco." ECF No. 1 at 26. Another report states, "Arlene said Reading sent her face book messages approximately two to three days ago. She received face book messages from Reading telling her the following: . . . Reading said he was going to take [petitioner's daughter] away from her and sell her . . . ." *Id*. at 28. Arlene testified at trial, "He said that he was going to send me back to New York and take my daughter and sell her in San Francisco." ECF No. 1 at 30-31; *see also* RT 1:33-34. Petitioner contends that these statements are inconsistent because Arlene testified at trial that petitioner had orally threatened her, even though she had stated in the police reports that petitioner had threatened her in text and Facebook messages. ECF No. 1 at 7. Petitioner argues that his trial counsel should have used these inconsistent statements to show that Arlene was not being truthful. *See id*. This claim lacks merit.[3]

A "doubly" deferential standard governs a federal habeas petitioner's claim of ineffective assistance of counsel. *See Richter*, 562 U.S. at 105. On direct appeal, the two-step inquiry from *Strickland v. Washington* guides the analysis for an ineffective-assistance-of-counsel claim. *See* 466 U.S. 668, 687 (1984). First, a criminal defendant must show some deficient performance by counsel that is "so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Id*. Second, the defendant must show that the deficient performance caused him prejudice, which requires "showing that counsel's errors were so serious as to deprive [the petitioner] of a fair trial." *Id*. On habeas review, coupled with Section 2254(d)'s fairminded jurist standard, the *Strickland* requirements become even more

---

[3] Respondent contends that Arlene's trial testimony is not inconsistent with her statements in police reports because she did not specify at trial whether petitioner made the threat orally or in text and Facebook messages. ECF No. 13 at 24-25. We assume that the statements are inconsistent.

`

deferential: the question is "whether there is *any* reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105 (emphasis added). That is, if there is even *one* reasonable argument that counsel did not violate the *Strickland* standard—even if the state court has not identified such argument—the petitioner cannot obtain habeas relief. *See id*. at 106.

Here, petitioner has not shown any deficient performance by his trial counsel. The attorney may have had a tactical reason not to impeach Arlene using petitioner's messages. A competent attorney could conclude that the distinction between threatening a victim orally and doing so via electronic messages was petty and that emphasizing the distinction would not help petitioner.

Petitioner's ineffective assistance of counsel claim lacks merit. No other claim remains. We will deny the petition in its entirety.

**III.    Certificate of Appealability**

A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district court's denial of a petition; he may appeal only in limited circumstances. *See* 28 U.S.C. § 2253; *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). Rule 11 Governing Section 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order adverse to a petitioner. *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997). A certificate of appealability will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires the petitioner to show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *accord Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Here, petitioner has not made a substantial showing of the denial of a constitutional right. Thus, the court should decline to issue a certificate of appealability.

**IV.    Order**

1.    The petition for a writ of habeas corpus, ECF No. 1, is denied.

2. The court declines to issue a certificate of appealability.

3. The clerk of court is directed to enter judgment in favor of respondent and close the case.

IT IS SO ORDERED.

Dated:  June 5, 2019

UNITED STATES MAGISTRATE JUDGE

No. 202.

`